## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| **LEONARD BROUSSARD**<br>**Plaintiff** | **CIVIL ACTION NUMBER:** |
| **VERSUS** | **JUDGE:** |
| **BAYER CROPSCIENCE, LP**<br>**Defendant** | **MAGISTRATE JUDGE:** |

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, **LEONARD BROUSSARD** (hereinafter referred to as "Plaintiff"), upon personal knowledge as to personal acts and upon information and belief as to all other matters, to allege in support of this Complaint as follows:

### I.     NATURE OF THE ACTION

1.    "LL601 Rice" also known as "Liberty Link Rice" is a type of genetically modified rice seed developed, manufactured, and field-tested by Defendant, **BAYER CROPSCIENCE, LP** ("Defendant"), in the United States.

2.    "LL601 Rice" is a variety of long-grain rice seed that has been genetically modified with a bacterial gene trait that causes the rice grown from that seed to produce a protein making the rice resistant to glufosinate.

3.    Glufosinate is the active ingredient in Liberty®Herbicide, another product developed and manufactured by Defendant, and the genetic modification of "LL601 Rice" to make the rice

1

resistant to glufosinate allows a crop of "LL601 Rice" to be sprayed with Liberty®Herbicide, which will kill all the weeds around the rice without damaging the rice.

4.      "LL601 Rice" was field-tested by Defendant in the United States between 1998 and 2001, but Defendant never sought to commercialize or otherwise market "LL601 Rice" because of warnings from both rice millers and rice processors as well as domestic and foreign rice producers that "LL601 Rice" would be rejected.

5.      During the years that Defendant field-tested "LL601 Rice" to the present, Defendant was aware that conventional rice, rice that has not been genetically modified, could become contaminated with "LL601 Rice" in many ways including, but not limited to, cross-pollination and commingling during planting, harvesting, handling, storage, transportation, and disposal, but Defendant failed to take action to prevent the cross-pollination and commingling of conventional rice with "LL601 Rice."

6.      Defendant knew or should have known before it developed, manufactured, and field-tested "LL601 Rice" that cross-pollination of conventional rice with "LL601 Rice" could not be prevented, but Defendant failed to take action to prevent the cross-pollination of conventional rice with "LL601 Rice."

7.      Defendant knew or should have known there would be commingling of conventional rice with "LL601 Rice" during planting, harvesting, handling, storage, transportation, and disposal, but Defendant failed to take action to prevent the commingling of conventional rice with "LL601 Rice."

8.      Defendant knew or should have known that rice production in the United States is a commodity-based system such that rice is gathered, shipped, an commingled from farms

across the United States through local and regional terminal elevators, so the commingling of conventional rice with "LL601 Rice" could not be prevented, but Defendant failed to take action to prevent the commingling of conventional rice with "LL601 Rice."

9.    Defendant knew or should have known that the segregation of genetically modified rice materially from conventional rice destroys the commercial viability of the entire rice crop, but Defendant failed to take action to prevent the commingling of conventional rice with "LL601 Rice."

10.    The scope of Defendant's alleged wrongdoing is astronomical because the alleged actions and inactions of Defendant have resulted in the contamination of the rice supply in the United States with "LL601 Rice."

11.    The contamination of the rice supply in the United States with "LL601 Rice" has decimated the rice futures market and the willingness of our export partners including, but not limited to, the countries comprising the European Union and Japan, to accept rice imports from the United States.

12.    On August 29, 2006, Richard Bell, the Arkansas Secretary of Agriculture, confirmed that "LL601 Rice" is now present in virtually *all* milled rice grown in the United States:

> Almost all the tests are showing up positive. It hasn't shown up in some of the rough rice. ***But I'm not aware of any milled rice it hasn't shown up in.*** That means the problem may be more than one variety. Or, perhaps, it's a result of variety mixing in storage...Its in at lease one variety and maybe more. Delta Farm Press, *Arkansas Secretary of Agriculture addresses GMO rice situation* (Aug. 29, 2006), available at http://deltafarmpress.com/news/060829-arkansas-gmo/ (emphasis added).

13.    The United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"), the Food and Drug Administration ("FDA"), and the United

States Environmental Protection Agency ("EPA") share responsibility for regulating biotechnology products to ensure that products developed in the United States undergo a rigorous pre-approval testing protocol to determine that they pose no risk to human health or the environment.

14. "LL601 Rice" could not be commercialized without the aforementioned regulatory approval because it is a genetically modified product.

15. Upon information and belief, Defendant did not seek regulatory approval for "LL601 Rice" until after Mike Johanns, the United States Secretary of Agriculture, announced that "LL601 Rice" had already been found in rice supplies destined for human consumption and export.

16. "LL601 Rice" was not deemed fit for human consumption by the USDA until November 24, 2006.

17. Defendant's conduct with respect to the events giving rise to the contamination of the rice supply in the United States with "LL601 Rice" is particularly egregious, because Defendant, though its predecessor company Aventis CropScience USA, LP, created the same contamination of the corn market in the United States less than six (6) years ago.

18. Plaintiff is a rice farmer, farming approximately one hundred ninety (190) acres in the State of Louisiana, who commercially cultivated or harvested conventional rice during the relevant time periods.

19. Plaintiff seeks compensatory and consequential damages, punitive or exemplary damages and injunctive relief arising from:

(a) Defendant's developing, manufacturing, and field-testing "LL601 Rice" with the knowledge that "LL601 Rice" was not approved for human consumption by the USDA.

4

(b)     Defendant's developing, manufacturing, and field-testing "LL601 Rice" with the knowledge that "LL601 Rice" was likely to contaminate conventional rice through cross-pollination.

(c)      Defendant's failure to adequately warn the field-testers of "LL601 Rice" to take the necessary precautions to prevent the cross-pollination of conventional rice with "LL601 Rice."

(c)     Defendant's developing, manufacturing, and field-testing "LL601 Rice" with the knowledge that "LL601 Rice" would commingle with conventional rice during planting, harvesting, handling, storage, transportation, and disposal.

(d)     Defendant's failure to take the necessary precautions to prevent the contamination of conventional rice with "LL601 Rice" due to commingling during planting, harvesting, handling, storage, transportation, and disposal.

(e)     The harm to Plaintiff resulting from the contamination of the rice supply in the United States by "LL601 Rice" including, but not limited to:

(i) diminished prices for the rice supply in the United States resulting from the loss of domestic and foreign markets for the rice;

(ii) increased costs to rice farmers resulting from the need to maintain the integrity of the rice supply;

(iii) increased costs to rice farmers resulting from the need to keep "LL601 Rice" from further entering the rice supply; and

(iv) contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, harvesting equipment, transportation facilities and equipment, and storage facilities.

20.     Upon information and belief, genetically modified rice is not grown commercially anywhere in the United States.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and Plaintiff is a citizen of the State of Louisiana and Defendant is a citizen of another state.

5

22. This Court has jurisdiction over Defendant because it is a corporation actively doing business in the State of Louisiana, has sufficient minimum contacts in the States of Louisiana, or otherwise intentionally avails itself of the markets within the State of Louisiana through the manufacturing, production, promotion, sale, marketing, and distribution of products in the State of Louisiana.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant provides services to the Plaintiff in this District, conducts substantial business in this District, resides in this District, or otherwise has sufficient contacts with this District to justify it being fairly brought into this District.

## III.   PARTIES

**Plaintiff**

24. Plaintiff is an individual of the full age of majority, residing in the Parish of Vermillion within the State of Louisiana, who grew long-grain rice in the Parish of Cameron during the relevant time periods and Plaintiff has never knowingly grown "LL601 Rice."

**Defendant**

25. Defendant is a Delaware limited partnership headquartered at 2 T. W. Alexander Drive, Research Triangle Park, North Carolina 27709.

26. Defendant includes Defendant, its parent companies, its predecessor companies, and all of its subsidiaries and affiliates.

27. Defendant was formed when its parent company, Bayer AG, bought its predecessor company, Aventis CropScience USA, LP, in October of 2001.

28. Defendant, by itself and through its parent companies, predecessor companies, and

subsidiaries and affiliates, produces or has produced genetically modified rice, including, but not limited to, "LL601 Rice."

## IV.    FACTUAL ALLEGATIONS

**Rice Cultivation in the United States**

29.    According to the USDA, about 50% of the rice grown in the United States is exported and the United States provides about 12% of the world's rice. (The estimate of the value for rice the rice supply in the United States for 2006 is approximately $1.9 billion.)

30.    The acreage devoted to rice production currently averages about 1% of the total crop-land harvested in the United States, but all rice harvested in the United States is produced from irrigated fields with yields among the highest in the world.

31.    Rice production in the United States is concentrated in six states: Arkansas, California, Louisiana, Mississippi, Missouri, and Texas. (Louisiana has the second largest area devoted to long-grain rice production accounting for about 20% of the acreage as well as 16% of the United States' crop.)

32.    In the United States, rice is referred to by length of grain: long, medium, and short.

33.     Long-grain rice, grown almost exclusively in the South, accounts for nearly 75% of United States rice production and 97% of Louisiana's rice production is long-grain rice. Medium-grain rice, grown both in California and the South, accounts for almost 25% of total United States rice production and nearly all of California's rice crop. Short-grain rice is grown mostly in California and accounts for approximately 2% percent of the total United States rice crop. In addition, the United States produces very small amounts of specialty rices, including aromatic or fragrant varieties.

7

34. The most common rice in the United States is Southern Long-Grain rice and this type of rice is also the most common rice consumed in the world.

35. In 2005, 80% of the rice exports from the United States were long-grain varieties.

36. 58% of the domestic utilization of the rice supply in the United States if for direct food use, 16% is used in processed foods, 16% is used in beer, and the remaining 10% is found in pet food.

37. Cross-pollination occurs in rice in natural conditions: when a weedy rice strain occurs within a cultivated rice crop, the flowering time, plant height and other features of the weedy rice strain will tend to shift to a point that is similar to the cultivated rice varieties growing in the same field because of their cross-pollination and genetic recombination. (According to published studies, as in many other crop species, transgene escape from cultivated rice varieties to their weedy and wild relatives through gene flow has become an indisputable fact.)

38. Rice production in the United States is a commodity-based system such that rice is gathered, shipped, an commingled from farms across the United States through local and regional terminal elevators.

39. Rice transportation and storage facilities are generally not equipped to test and segregate rice varieties so testing and segregation of rice varieties at these facilities causes disruption and expense.

**Genetically Modified Rice Seeds**

40. Biotechnology has made it possible to introduce new genetic characteristics into plant seeds.

41. The genome, genetic composition, of a seed can be altered by transferring a transgenic event

8

into the seed genome. (An transgenic event contains, among other things, a specific gene that expresses a desirable characteristic in the seed and the insertion of a specific transgenic event into a seed alters or modifies a seed's genome to confer a desired characteristic or trait on the crops grown from the seed.)

42. Genetically modified seeds are created through laboratory processes whereby genetic material from a foreign species is inserted into the DNA of a traditional plant to affect a desired trait in the future generations of that plant.

43. "LL601 Rice" is a variety of long-grain rice seed that has been genetically modified with a bacterial gene trait that causes the rice grown from that seed to produce a protein making the rice resistant to glufosinate.

44. Glufosinate is the active ingredient in Liberty®Herbicide, another product developed and manufactured by Defendant, and the genetic modification of "LL601 Rice" to make the rice resistant to glufosinate allows a crop of "LL601 Rice" to be sprayed with Liberty®Herbicide, which will kill all the weeds around the rice without damaging the rice.

45. In the United States, the first genetically modified food product, a delayed-ripening tomato, was marketed in 1994.

46. Since their advent and commercial introduction, genetically modified seeds have been adopted by farmers at unprecedented rates and genetically modified seeds have become available for many crops.

47. However, upon information and belief, genetically modified rice is not grown commercially anywhere in the United States.

**LL6OI Rice**

48. "LL601 Rice" was developed by Defendant by genetically modifying long-grain rice to resist the Liberty® Herbicide.

49. As a genetically-modified product, "LL601 Rice" was subject to regulatory approval prior to commercialization, but Defendant did not obtain such approval until November 24, 2006, eight years after it began field testing "LL601 Rice" and two (2) months after Richard Bell's, the Arkansas Secretary of Agriculture, announcement that "LL601 Rice" was in virtually all milled rice grown in the United States.

50. In testing, growing, transporting, storing, and disposing of "LL601 Rice," Defendant failed to comply with responsible growing practices because Defendant knew that it was impossible to completely isolate "LL601 Rice" from other varieties of rice and that "LL601 Rice" would inevitably cross-pollinate with other rice plants.

51. Furthermore, Defendant knew or should have known that "LL601Rice" would contaminate the rice supply in the United States unless strict precautionary measures were implemented at all levels of the rice production chain in the United States, from planting through distribution, transportation, storage, and disposal.

**Problems Begin To Emerge**

52. In late 1998 and early 1999, concerned with the health and safety aspects of genetically modified crops, the general public in many European Union ("EU") countries rejected food products containing genetic modifications of any type and these concerns slowed European registrations for various genetically modified crops and some registrations were even denied.

53. Defendant was aware of these concerns regarding the health and safety aspects of genetically modified crops and the potential detrimental market effects arising therefrom.

10

54.     Defendant's predecessor, Aventis CropScience USA, LP, conducted field tests of "LL601 Rice" between 1998 and 2001, but ultimately decided not to commercially develop "LL601 Rice."

55.     In May of 2001, the Houston Chronicle reported:

> One by one Monday, 18-wheel trucks began hauling away nearly 5 million pounds of genetically modified rice from a Brazoria County farm to a landfill for burial.
>
> The rice, the first to be genetically enhanced, was approved by the US Food and Drug Administration and the United States Department of Agriculture, but approval by the Environmental Protection Agency is pending.
>
> Without EPA approval, the rice cannot be served as food, say officials with Aventis CropScience which developed the biotech rice.
>
> The rice could have been marketed for human consumption had it remained in storage bins until the EPA granted approval, but Aventis wanted to be sure it could properly manage the experimental crop and track its location, said Peg Cherny, a company spokeswoman.
>
> Aventis has been criticized for losing track of some of its genetically modified StarLink corn, which reached consumers before it had received government approval.
>
> Aventis 'didn't want to create an issue' with its biotech rice Cherny said. The rice has been dubbed 'LibertyLink' because it is resistant to Liberty herbicide, a weedkiller commonly used on corn and canola.
>
> * * *
>
> Harvested last August, about 250,000 pounds will be retained for Aventis to use for testing. The rest, about 4.75 million pounds, will be buried. Houston Chronicle, *Biotech rice is headed for landfill burial/4.75 million pounds of modified grain dumped because it lacks EPA approval* (May 22, 2001), available at http://www.chron.com/CDA/archives/archive.mpl?id=2001_3306449.

56.     On August 19, 2006, Mike Johanns, the United States Secretary of Agriculture, announced that unapproved rice had been found in supplies destined for human consumption and export.

57.     In an August 22, 2006, article in the New York Times, Riceland Foods, an Arkansas-based

farmer-owned cooperative, disclosed that rice samples from its five-state growing region —Arkansas, Mississippi, Missouri, Louisiana and Texas — had tested positive for "LL601 Rice."

58.  Officials later announced that "LL601 Rice" had been found in bins in Arkansas and Missouri that held rice from the 2005 crop, but the rice in those bins might have come from other states.

59.  Riceland Foods, based in Stuttgart, Arkansas, markets rice produced by its 9,000 farmer-members in the Southern rice-producing states and, in 2005, Riceland marketed rice produced in 2005 by farmers in Arkansas, Missouri, Mississippi, Louisiana and Texas.

60.  On or about August 18, 2006, Riceland Foods stated that the existence of a genetically modified product in its rice was discovered in January of 2006, by one of its export customers.

61.  Riceland Foods said that because genetically engineered rice was not grown commercially in the United States it was initially thought that a small amount of genetically engineered corn or another crop had been mixed in with rice.

62.  On or about that same date, Riceland Foods further disclosed that in May of 2006, Riceland Foods collected rice samples from several grain storage sites and found positive results for "LL601 Rice."

63.  Riceland Foods stated that it advised Defendant of the findings and Defendant confirmed those findings.

64.  Defendant found that "LL601 Rice" was present at levels equivalent to 6 of every 10,000 grains.

65. Despite this admission, Defendant did not report the aforementioned findings to the USDA until July 31, 2006.

66. This widespread cross-pollination and contamination of conventional rice with for "LL601 Rice" has had a broad and adverse impact on Plaintiff and all rice farmers.

67. Defendant's wrongful conduct has rendered hundreds of millions of bushels of rice grown on tens of millions of acres of farmland unfit for human consumption or otherwise suspect in the domestic and foreign rice markets, which has resulted in worldwide market value loss for rice from the United States.

68. An August 22, 2006, Wall Street Journal article reported:

> Trading partners abroad began tightening their controls on American- grown rice after the discovery of an accidental release of a genetically modified variety unapproved for sale by U.S. regulators.
>
> Prices of rice futures contracts sank yesterday as countries such as Japan and South Korea moved to prevent the genetically modified rice from coming into their markets from the U.S., which counts on foreign customers to buy roughly half of its annual production.
>
> In trading at the Chicago Board of Trade yesterday, the price of the rough rice contract for November delivery dropped 26 cents a hundredweight to settle at $9.84 a hundredweight. Wall Street Journal, U.S. Rice Prices Are Stunted by Concerns of Biotech Controls (Aug. 22, 2006), available at http://www.truthabouttrade.org/print.asp?id=6207.

69. On August 22, 2006, rice futures fell by the daily trading limit of 50 cents per hundredweight — or more than five percent — the sharpest one-day decline in several years.

70. Since news of the commingling of for "LL601 Rice" with conventional rice was first released, the market price of rice at the Chicago Board of Trade has fallen approximately 8-10% resulting in not less than hundreds of millions of dollars in losses for rice farmers in

13

the United States.

71.  On August 23, 2006, the European Union issued the following statement banning imports

of rice from the United States until to is certified as being free of genetic modifications:

> The European Commission has today adopted a decision requiring imports of long grain rice from the USA to be certified as free from the unauthorized GMO (genetically-modified organisms) LL Rice 601. The decision has been taken in light of the recent announcement by the US authorities that this unauthorized GMO had been found in samples of commercial rice on the US market. The emergency measures adopted by the Commission today mean that, with immediate effect, only consignments of US long grain rice that have been tested by an accredited laboratory using a validated testing method and accompanied by a certificate assuring the absence of LL Rice 601, can enter the EU.

> Markos Kyprianou, Commissioner for Health and Consumer Protection, said "We have strict legislation in place in the EU to ensure that any GM product put on the European market has undergone a thorough authorization procedure based on scientific assessment. There is no flexibility for unauthorized GMOs - these cannot enter the EU food and feed chain under any circumstances, the measures we have taken today will ensure that unauthorized GM rice is not inadvertently imported. EU consumers can rely on the high level of protection that our GM rules afford them.

> Under EU food safety legislation, only GMOs which have undergone a thorough scientific assessment and authorization procedure may be put on the EU market. The decision adopted today therefore aims to prevent the unauthorized LL Rice 601 from reaching EU consumers, by ensuring that only rice certified as free from this GMO enters the EU. The measures will enter into effect immediately, and are expected to be reviewed after 6 months.

> Member States authorities are responsible for controlling the imports at their borders and for preventing any contaminated consignments from being placed on the market. In addition, they should carry out controls on products already on the market, to ensure that they are free from LL Rice 601. Business operators importing rice from the USA also have responsibility for ensuring that LL Rice 601 does not enter the EU food chain and that imports are certified as free from this unauthorized GMO, in accordance with the EU food law principle that operators are responsible for the safety of the food or feed that they place on the market." European Union News Releases, EU Requires US to Certify Rice Exports are Free of Unauthorized GMO (Aug. 23, 2006), available at http://www.eruunion.org/Newa/press/2006/20060073.htm.

14

72.     On August 29, 2006, the United States Rice Producer Association reported wide-spread positive results for "LL601 Rice" throughout the gulf and delta rice region in the 2005 and 2006 crops.

73.     Defendant knew or should have known that once "LL601 Rice" became commingled with the general rice supply in the United States identity determination and segregation of the entire rice supply would be required in order to prevent "LL601 Rice" from entering the domestic and international food supply channels and that such a situation would involve huge disruptions in the rice trade, impose significant added costs on rice farmers in the United States, and detrimentally impact worldwide prices for rice from the United States causing severe financial damage to rice farmers.

74.     Despite this knowledge, Defendant field-tested "LL601 Rice" without adequate safeguards to prevent cross-pollination and commingling.

75.     On information and belief, Defendant failed to adequately instruct, oversee or control experimental field project growers to ensure that "LL601 Rice" was adequately segregated or contained adequate buffer zones.

76.     Such wrongful and deliberate conduct by Defendant led directly to the cross-pollination, contamination, and market deterioration problems that damaged Plaintiff and all rice farmers.

77.     Defendant's wrongful conduct also led to the direct introduction of contaminated rice into the United States consumer market

78.     The extent of the contamination of the rice supply in the United States, and the damages arising therefrom, is still being determined, but the scope of damage arising from Defendant's conduct is being recognized as far worse than originally believed.

79.    On August 29, 2006, Richard Bell, the Arkansas secretary of Agriculture, confirmed that "LL601 Rice" is now present in virtually *all* milled rice grown in the United States:

Almost all the tests are showing up positive. It hasn't shown up in some of the rough rice. ***But I'm not aware of any milled rice it hasn't shown up in.*** That means the problem may be more than one variety. Or, perhaps, it's a result of variety mixing in storage...Its in at lease one variety and maybe more. Delta Farm Press, *Arkansas Secretary of Agriculture addresses GMO rice situation* (Aug. 29, 2006), available at http://deltafarmpress.com/news/060829-arkansas-gmo/ (emphasis added).

80.    As a result of the presence of "LL601 Rice" in a wide range of rice crops in the United States and of the fact that "LL601 Rice" has been found in rice destined for export markets, confidence in the integrity and safety of the rice crop from the United States has evaporated in foreign markets, particularly in Japan and the European Union.

81.    Because of Defendant's wrongful conduct, rice destined for foreign markets for use in food products has been rejected for the purposes for which it was intended or substantially discounted in price, thereby, detrimentally impacting the domestic and foreign rice markets and damaging Plaintiffs.

82.    As a result of Defendant's wrongful conduct, Japan, the largest foreign market for United States rice, has already prohibited all imports of United States rice and the European Union has prohibited all United States rice imports unless they have been scientifically tested and found to not be contaminated with "LL601 Rice."

83.    In 2005, the United States exported 224,000 metric tons of rice to the European Union worth $813 million, of which 198,000 tons was long-grain rice.

84.    On information and belief, Mexico, the largest importer of United States rice, approximately 125 million tons of rice was exported to Mexico in 2005, is still considering its response to

the contamination of the rice supply in the United States with "LL601 Rice.

85.  Further, on information and belief, many United States food producers have rejected United States rice out of concern that the rice supply has been contaminated by "LL601 Rice."

86.  Thus, as a result of Defendant's wrongful conduct, other rice processors and food manufacturers have or likely will become concerned about the presence of "LL601 Rice" in raw products coming into their food manufacturing facilities, thereby, further softening the market for United States rice and further damaging Plaintiff.

**The Further Impact of LL6OI Rice on Plaintiff**

87.  The introduction of "LL601 Rice" into the general human food supply has detrimentally affected the ability of Plaintiff to get its rice into export channels

88.  Furthermore, many rice exporters will undertake and require expensive and time-consuming testing of all rice crops prior to sale to determine that they are not contaminated with "LL601 Rice."

89.  The economic burden of testing commercial rice crops and segregating "LL601 Rice" from the general United States rice supply will be transferred to United States rice farmers by diminished bids for rice brought to the market.

90.  The impact of rice testing will additionally burden United States rice farmers by potentially requiring loads of rice that test positive to be destroyed or barred from export.

91.  The presence of "LL601 Rice" in rice food products and in the general United States rice supply has and will result in the loss of certain markets within the United States and certain export markets for the rice and will continue to result in reduced prices for all rice from the United States.

92.   The cost of segregating conventional rice from "LL601 Rice" will be significant and United States rice farmers, including Plaintiff, will be required to take extra steps and incur additional expenses in an effort to preserve the integrity and economic value of their rice crops.

93.   Many United States rice farmers have also sustained damages to their property as a result of Defendant's wrongful conduct, through the contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

94.   Defendant's wrongful conduct continues to place Plaintiff at risk for further damages caused by the cross-pollination and contamination of conventional rice with "LL601 Rice" because of the continued detrimental market effects of the "LL601 Rice" on the United States futures market and, concomitantly, United States rice prices.

## V.   <u>INJURIES TO PLAINTIFF</u>

95.   The detection of "LL601 Rice" in the United States rice supply has already resulted in the loss of certain domestic and foreign markets for rice from the United States and will continue to do so. (For example, it has been reported that India, a major competitor to the United States in the rice export market, has already made overtures to Japan to provide additional rice imports to that country to replace the United States' market share in Japan.)

96.   The  market changes resulting from "LL601 Rice" contamination have also created inefficiencies expressed in lower rice prices and higher producer costs.

97.   Many rice buyers are also not likely to accept deliveries of rice from the United States without proof that the rice being delivered is free of "LL601 Rice" contamination, which will

require expensive and time-consuming testing of rice.

98.  The costs of storing and moving "LL601 Rice" through segregated channels will also be significant because before "LL601 Rice" was introduced, all rice could be handled in the same way so rice farmers, including Plaintiff, will share the economic burden of these costs associated with segregating conventional rice from "LL601 Rice.".

99.  As set forth above, the impact of testing for "LL601 Rice" contamination at various points in the rice marketing channel will add extra expense because loads of rice that test positive will be excluded from certain markets so rice farmers, including Plaintiff, will share the economic burden of these extra expenses.

100. Commodities traders, financial reporters, and agricultural officials have stated that "LL601 Rice" contamination has and will continue to detrimentally impact rice prices, rice futures prices, and United States rice exports.

101. As a result of Defendant's wrongful conduct, many rice farmers have also suffered harm to their property through the contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, harvesting equipment, transportation facilities and equipment, and storage facilities.

102. Plaintiff has been damaged by Defendant's actions and inactions and there is a continuing risk of additional damages to Plaintiff arising out of Defendant's wrongful conduct.

## VI.  CLAIMS ALLEGED

### COUNT I - NEGLIGENCE

103. For the purposes of Count I, Plaintiff repeats and realleges each of the previous paragraphs as though fully set forth herein.

104. Defendant's actions or inactions as described in the previous paragraphs constitute negligence.

105. Defendant had a duty to Plaintiff to develop, manufacture, and field-test "LL601 Rice" in the manner that would not result in contamination of neighboring crops of conventional rice or contamination of the rice supply United States.

106. Defendant breached this duty this duty to Plaintiff by developing, manufacturing, and field-testing "LL601 Rice" in violation of standards that would prevent cross-pollination and commingling of conventional rice with LL601 Rice."

107. Defendant also had a duty to Plaintiff to refrain from developing, manufacturing, and field-testing "LL601 Rice" in a manner that could foreseeably cause harm to Plaintiff.

108. Defendant breached this duty to Plaintiff by failing to exercise reasonable care to prevent the foreseeable contamination of the rice supply in the United States with "LL601 Rice" through cross-pollination and commingling.

109. Defendant's breaches of the duties owed to the Plaintiff are the direct and proximate cause of the damages suffered by the Plaintiff.

110. The Plaintiff has suffered injury and property damage by Defendant's developing, manufacturing, and field-testing of "LL601 Rice"

111. The Plaintiff seeks the following: compensatory damages for the losses caused by Defendant's actions; punitive damages as a result of Defendant's reckless and willful conduct injunctive relief requiring that Defendant decontaminate the Plaintiff's farmland, Plaintiff's farming, harvesting, as well as transportation equipment, and Plaintiff's on-farm storage facilities, to prevent future contamination; and pre- and post-judgment interest as well as all

costs and attorneys' fees as allowed by law.

## VII.  <u>JURY DEMAND</u>

112.    Plaintiff is entitled to and demands a trial by jury.

## VIII.  <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, Plaintiff, **LEONARD BROUSSARD**, respectfully requests that the Court

enter a judgment as follows:

A.      A judgment and decree that Defendant, **BAYER CROPSCIENCE, LP**, is liable to Plaintiff
        for:

       (1)     Negligence.

B.      A judgment ordering Defendant:

       (1)     To pay compensatory and consequential damages to Plaintiff;

       (2)     To pay exemplary and punitive damages to Plaintiff;

       (3)     To decontaminate the Plaintiff's farmland, Plaintiff's farming, harvesting, and
                transportation equipment, as well as Plaintiff's on-farm storage facilities, to prevent
                future contamination of the rice crop with "LL601 Rice;"

       (4)     To pay the costs of this action including, but not limited to, attorneys' fees and
                expenses;

       (5)     To pay pre-judgment and post-judgment interest; and

       (6)     Such other and additional relief as the Court deems equitable, appropriate, and just.

**Dated**:    March 10, 2007

**BY ATTORNEYS:**

**MURRAY LAW FIRM**

**/s/ Jessica W. Hayes (#28927)**
Stephen B. Murray (# 9858)
**Jessica W. Hayes (# 28927)**
Arthur M. Murray (# 27694)
Nicole Ieyoub-Murray (28088)
**MURRAY LAW FIRM**
909 Poydras Street, Suite 2550
New Orleans, LA 70112-4000
Telephone: (504) 525-8100

and

Michael Cox (22026)
**COX, COX, FILO & CAMEL**
723 Broad Street
Lake Charles, LA 70601
Telephone: (337) 436-6611
and

Barry A. Roach (# 21838)
**LARRY A. ROACH, INC.**
2917 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 433-8504

and

Scott A. Stefanski (# 21895)
Russell Zaunbrecher (# 09045)
**STEFANSKI & ZAUNBRECHER**
125 East Hutchinson
P.O. Drawer 730
Crowley, LA 70527
Telephone: (337) 783-7000